1

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF NEW YORK

3
- - - - - - - - - - - - X          24-MJ-1204
4   UNITED STATES OF AMERICA,
                    Plaintiff
5
           Vs.                              Buffalo, New York
6   PETER CELENTANO,                        October 21, 2024
                    Defendant
7   - - - - - - - - - - - - X

8
             TRANSCRIPT OF DETENTION HEARING
9       BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
             UNITED STATES MAGISTRATE JUDGE
10

11          U.S. ATTORNEY'S OFFICE
            BY: JEFFREY INTRAVATOLA, ESQ.
12          138 Delaware Avenue
            Buffalo, New York 14202
13          Appearing on behalf of the Plaintiff

14          GALLO & IACOVANGELO LLP
            BY: JAMES SCOTT WOLFORD, ESQ.
15          180 Canal View Boulevard
            Suite 100
16          Rochester, New York 14623
            Appearing on behalf of the Defendant

17

18

19

20

21

22
            COURT REPORTER:Brandi A. Wilkins
23          scalisba@gmail.com
            Kenneth B. Keating Federal Building
24          100 State Street, Room 1250A
            Rochester, New York 14614
25

```
 1              THE CLERK:  All rise.
 2              THE COURT:  Good afternoon.  Please be
 3      seated.
 4              THE CLERK:  We are on the record in the
 5      matter of United States of America versus Peter
 6      Celentano criminal matter number 24-MJ-1204.  We're
 7      here for a detention hearing.  For the Government, we
 8      have AUSA Jeffrey Intravatola.  The defendant is
 9      present with attorney James Wolford.  From the United
10      States Probation Office, we have Officer Andre McCrae.
11      The Honorable Jeremiah J. McCarthy presiding.
12              THE COURT:  Good afternoon, again, everyone.
13              MR. INTRAVATOLA:  Good afternoon.
14              MR. WOLFORD:  Good afternoon, Your Honor.
15              THE COURT:  You both received the pre-trial
16      services report dated October 18?
17              MR. INTRAVATOLA:  Yes, Your Honor.
18              MR. WOLFORD:  Yes, Your Honor.
19              THE COURT:  All right.  I apologize for the
20      confusion on Friday when I initially ordered Mr.
21      Celentano released and then on further reflection I --
22      I decided I needed to think about this a little more.
23      So that's why I ordered him detained.  In light of the
24      pre-trial services report, I'll hear from whoever
25      wishes to be heard.
```

3

1          MR. INTRAVATOLA:  Thank you, Judge.  I've

2    also of course reviewed Probation's recommendation

3    here.  The Government still strongly believes that

4    detention is appropriate.  I don't believe Probation

5    made the recommendation with the benefit of them

6    having reviewed the defendant's social media posts.

7    Defendant had taken his social media down shortly

8    before law enforcement executed the state search

9    warrant so I don't think it would have been possible

10   for them to have reviewed the posts that I referenced

11   last week.  And frankly, probation's determination and

12   I respect it --

13          THE COURT:  Well, just a minute.  Mr.

14   McCrae, you were present in the courtroom on Friday;

15   right?

16          OFFICER MCCRAE:  That's correct, Judge.

17          THE COURT:  Yeah.  So you heard the proffer

18   --

19          OFFICER MCCRAE:  Yes.

20          THE COURT:  Concerning the social media

21   posts.  Did that -- would that in any way effect your

22   recommendation?

23          OFFICER MCCRAE:  No, Judge.  After hearing

24   the proffer, that's the recommendation of our office.

25   We stand by our recommendation.

1          THE COURT:  Okay.  All right.

2          MR. INTRAVATOLA:  Well, Judge, as I noted I

3    respect Probation's if not on the matter, and frankly,

4    I think their determination is not surprising because

5    to reference a few other posts by defendant he has

6    made social media posts that emphasize the benefit of

7    maintaining a public persona that does not attract the

8    attention of law enforcement.  For instance on again

9    Twitter defendant --

10          THE COURT:  Wait a second.  Are you now

11    getting into additional posts that weren't proffered

12    on Friday?

13          MR. INTRAVATOLA:  Yes, Judge.  I confirmed

14    with law enforcement.  I didn't have frankly every

15    single post.  I've since provided them to defense

16    counsel anything that I would reference today, Judge.

17    I'm happy to also pass them up to Your Honor if you

18    are interested.

19          THE COURT:  Okay.

20          MR. INTRAVATOLA:  Would the Court prefer if

21    I do that?

22          THE COURT:  Yeah, I'd like to see them.  Do

23    you have extra copies?

24          MR. INTRAVATOLA:  Yes, Judge.

25          THE COURT:  Okay.  Yes, please.

 1    (There was a discussion off the record.)

 2            MR. INTRAVATOLA:  And Judge, some of these I

 3    did go through.  I'm not going to walk through every

 4    single one.

 5            THE COURT:  Right.  Okay.

 6            MR. INTRAVATOLA:  But I filed them for

 7    purposes of today and I provided all of those to

 8    defense counsel this morning.  And so -- oh, I'm

 9    sorry.  There's a second page.  Let me provide those

10    as well.  Jim, I don't have another copy of these but

11    I did send them to you.

12            MR. WOLFORD:  Yes, you did.  Yes, you did.

13    I have copies.  Thank you.

14            MR. INTRAVATOLA:  And Judge, first I'm going

15    to read from the document that I just handed up to the

16    court.  Now, Dr. Freeman 1337 is defendant's social

17    media handle.  I can get into how law enforcement

18    determined that but ensure they went through their

19    investigation and they received a search warrant on

20    these social media platforms.

21            So to go back to what I was saying a few

22    moments ago about in person persona versus online

23    persona, you note you'll see on February 11 defendant

24    says people forget about the in person op sec.  Op sec

25    is short for operations security.

1              THE COURT:  Well, wait.  Where are you on

2      this page?

3              MR. INTRAVATOLA:  About a paragraph down

4      from the top, Judge.  If you see kind of the circled

5      box of February 11.

6              THE COURT:  Yes.  Oh, I see.  Okay.  Okay.

7              MR. INTRAVATOLA:  So defendant states people

8      forget about the in person op sec, operations

9      security.  It's not just staying safe on the internet.

10     It's holding up the persona to your neighbors, in real

11     life friends and family that you are not committing

12     any big boy, and it goes on I believe to say felonies,

13     but I don't have the benefit of that.

14              However, we have a clue as to what he said

15     because he continues and the way that X works is you

16     can kind of respond to yourself, there's a character

17     limit.  So if you see directly above that he says

18     adding onto this, in other words continuing that post.

19     He says don't put come and take it or other lettering

20     on your car if you are transporting unregistered NFA

21     items.  Don't speed.  Be a good and kind neighbor.

22     Don't outwardly act like an in sell to those who might

23     report you.  Don't give people reason to suspect you.

24              And so Judge, that online persona is

25     concerning for us here.  It's true that defendant has

1      no criminal history and leads a seemingly normal life

2      which I'm sure came across to probation but his online

3      persona remains deeply troubling.

4              THE COURT:  How do you know it's his?  Dr.

5      Freeman 13?

6              MR. INTRAVATOLA:  Sure, Judge.  Just a

7      moment.  Basically the user name freeman 1337 was in

8      the initial call that an anonymous source made to law

9      enforcement when it kind of started things on this

10     investigation, Judge, and that initially tied

11     defendant to this Twitter account.  Further, the

12     profile picture for defendant's social media accounts

13     match other firearms that were recovered from

14     locations that defendant hid evidence.

15             Additionally, the individual referenced in

16     the complaint known as MS confirmed that Celentano was

17     the user of the Twitter account.  And so the

18     photographs that I have passed up today are recovered

19     from a search warrant that law enforcement executed on

20     the social media accounts as well as from other

21     observations that law enforcement had made of those

22     accounts prior to defendant's deactivation of them.

23             And so just to get back to defendant's

24     persona there, Judge, I recognize defendant has no

25     criminal history and that an individual's criminal

1    history is of course important to the Court's analysis

2    today.  But that criminal history does not give a

3    complete perspective into an individual's mind.  I

4    would submit that a more accurate picture of what's

5    going through defendant's head can be found in what he

6    says and what his persona is when he thinks he's

7    anonymous.

8              And so I had passed up that other piece of

9    paper, Judge, of the various posts.  I'd just like to

10    go through a few more of those today and these have

11    all been provided to defense counsel.  On page -- I

12    know that they're not numbered and I apologize.

13              THE COURT:  Well, let me go to the first

14    page first.

15              MR. INTRAVATOLA:  Some of these posts,

16    Judge, I did touch upon on Friday.  This is a broader

17    combination of those and I'm happy to walk through

18    every single one if the Court would like.

19              THE COURT:  Yeah.  Why don't you do that?

20              MR. INTRAVATOLA:  Okay. Sure, Judge.  On

21    Page 1 we have a photo of an individual holding up

22    what looks to be a tweet, and it says ahem, fuck cops.

23              THE COURT:  What does that have to do with

24    the defendant?  Was that on his --

25              MR. INTRAVATOLA:  Yes, Judge.  Every single

1    one of these posts was made on defendant's Twitter

2    account the freeman 1337 that I referenced earlier.

3            THE COURT:  Okay.

4            MR. INTRAVATOLA:  I think the intent behind

5    that one is self explanatory so I'll move on.  The

6    second post is what looks to be a clipping from a news

7    article, and of course, some of this, Judge, just to

8    clarify is of course my interpretation of what we are

9    seeing here.

10           THE COURT:  Right.

11           MR. INTRAVATOLA:  However, this is simply a

12   clipping of a news article which says criminals

13   exploit hobbyists who share tips on 3D printed guns.

14   Now, that's not necessarily nefarious post for people

15   or law enforcement but it ties defendant's interests

16   into 3D printed firearms.  Next we have a screen shot

17   of a conversation again this was posted on his Twitter

18   which says would you sell a Glock lower?  I don't want

19   to buy a 3D printer.

20           The individual who we believe to be

21   defendant says LOL that's a felony.  No, can't do it,

22   but setting up an ender 3, in other words a device for

23   manufacturing privately made firearms, is pretty easy

24   and a printer is like $200 for what it's worth.  On

25   the next page, Judge, and I do remember referencing

1    this one on Friday we have an individual pointing a

2    gun and it says your rights are being stripped away by

3    people with names and addresses.

4         The following page depicts Homer Simpson

5    being hit over the head with a chair.  Homer Simpson

6    is captioned American gun owners.  Bart Simpson

7    holding the chair is captioned infringements for

8    protection.  In the image below that, you have Homer

9    Simpson now holding the chair standing behind Bart

10   with the implication being that he's about to hit him

11   and Homer Simpson is captioned reasonable people

12   pushed to unreasonable.  Bart is captioned big

13   Government thinking they did something.

14        On the next page, we have Twitter post that

15   states LOL fuck the AFT and their warnings.  I'm here

16   to arm the masses.  And so --

17        THE COURT:  And you think that is from

18   defendant?

19        MR. INTRAVATOLA:  Yes, Judge.  That post

20   about arming the masses is tied to defendant based on

21   my explanation earlier and that one is particularly

22   notable here because he's saying he's here to arm the

23   masses.  This is an individual who has demonstrated

24   expertise in how to privately manufacture firearms.

25   Law enforcement has seized the means that defendant

1  used to make privately manufactured firearms, the

2  printers, the various other types of tools for

3  assembling firearms and now you hear defendant in his

4  own words saying I'm here to arm the masses, and I'll

5  get back to that momentarily, Judge.

6          The next page notes -- it's a photo of Mr.

7  Rogers, the children's show host, and it's seemingly

8  nice image with rainbows and things and a stuffed

9  animal in front of him but the caption is if they send

10  one of yours to the hospital send six of theirs to the

11  morgue.

12          On the next page, you have a I'm going to

13  call it a monster posed behind an individual who looks

14  like they are either in law enforcement or a soldier

15  and the caption is when the Feds track you down to

16  your Appalachian cave home but you've been training a

17  actual fucking wendingo in guerilla warfare after

18  feeding him chicken tenders and Bang energy drinks for

19  the past six months.

20          And the next page, Judge, this is a post

21  that I didn't have a chance to highlight on Friday.

22  It's from the defendant's Twitter account and it says

23  for what it's worth, why even comply with New York or

24  California law?  Interstate commerce laws being what

25  it is.  What can those states' AGs do to you being in

1  Michigan if you choose not to comply with their

2  state's laws.

3        Following post is on a -- it's a screen shot

4  of a Reddit legal advice post, Judge, and it says is

5  it illegal to tell a cop to kill themselves?  Just

6  wondering.  On the following page you have a post from

7  defendant stating it's a photo of what looks to be a

8  firearm and defendant's caption is this is my

9  unregistered 50 caliber AR15 machine gun.  No BG,

10  assuming that's background check, for it and I can

11  still hunt deer with it.  Does this scare you more

12  than that little bitty 308?

13        On the next page, we have a ghost writing on

14  a chalk board, and this post -- this image is in

15  response to the post below that, Judge.  The post

16  below that is from an account called the force and

17  it -- that post says civilians have no constitutional

18  right to military grade weapons period.  The second

19  amendment is not a license to challenge law

20  enforcement or overthrow your Government.  The second

21  amendment is for your own personal protection period.

22        And so defendant's post that he reposts is

23  it says that the second amendment is for shooting

24  cops.  I think the intent behind that was self

25  explanatory, and if it wasn't, the following page is

13

1    another post from defendant which says AR15s are for

2    shooting cops and anyone else who attempts to step out

3    on liberty.  This next page, frankly, I'm not entirely

4    familiar with what this one means.  Although, I will

5    note that the bottom right corner of the image says

6    auto safety and that appears to be a firearm part.

7              And lastly, I believe this is the final

8    page, we have the defendant responding to an account

9    called Iron Wolf.  Iron Wolf says murder isn't always

10   wrong.  There are times when it's justified.  Only the

11   sift on the absolutes, I believe that's a Star Wars

12   reference.  I'm not saying abortion is morally okay

13   but the alternative in the case of rape victims is

14   worse in my opinion.

15             Now, the defendant responds to that saying

16   murder is always wrong.  The majority of killing is

17   not in fact murder.  And lastly, we have a post where

18   an account called weapons daily posts what looks to be

19   a heavily modified pistol with the caption is this

20   legal?  Defendant responds who cares?  Gun laws are

21   for pussies anyway.

22             And so Judge, that's just a sampling of what

23   defendant's online persona is.  I think that gives

24   more of a perspective into defendant's thoughts than

25   what his public persona which he has extolled the

1    virtues of in other posts say to probation.  And so on

2    the criminal history point and on the defendant's

3    background point, sure.  Defendant doesn't have any

4    criminal history, but what he says when he thinks he's

5    anonymous and doesn't show his face is this fringe

6    extremist persona, and notably with respect to these

7    accounts and other accounts associated with defendant

8    that law enforcement has uncovered, he used VPNs which

9    I'm not a technology expert, Judge, but the purpose of

10   a VPN is to disguise an individual's online persona

11   online identity and your whereabouts online.  And so

12   he uses VPNs to disguise himself in making these

13   posts.  He also used an account called Proton Mail.

14   It's an encrypted email service that's made for

15   purposes of being anonymous online and so it's not

16   just defendants ideas here that he promotes on social

17   media, Judge.  It's the reach that social media has.

18   It's the tech savviness that I mentioned on Friday,

19   the VPN that he posts -- or the VPN that he utilizes

20   to make sure that his posts are disguised.  At least

21   he thinks they're disguised, but this reach that

22   social media has, these dangerous memes, these guns,

23   they offer a portrait into the defendant's mind, and

24   in fact, in 2022, Judge, the National Institute of

25   Justice put out a study.  There were so many mass

1    shootings over the past few years, and so they began

2    to profile them and try to find commonalties, and many

3    mass shooters they study concluded are radicalized

4    online.  That same study noted that approximately 45%

5    of mass shooters had no criminal history whatsoever.

6            And so for instance I would just highlight

7    Stephen Paddock who the Court may be familiar with as

8    the shooter behind the Las Vegas massacre.  Paddock

9    was 64 years old, had no criminal history, Judge.  He

10   used AR15 style rifles like many of the firearms

11   recovered here and he killed 60 people and wounded at

12   least 413 people.  He was 64, Judge.  He had no

13   criminal record, and news posts after that event, that

14   tragedy said things like family and neighborhood --

15   family and neighbors are shocked that he could have

16   killed dozens of people.

17           Judge, here, we have the benefit of all the

18   clues right in front of us.  We have posts about

19   killing cops.  Posts about AR15s like the ones in this

20   case being made for killing cops.  Posts asking if

21   it's illegal to tell a cop to kill themselves amongst

22   many other concerning posts, and so this case involved

23   not just 59 machine guns but also the 200 privately

24   made firearms that law enforcement also seized and all

25   of that by its very nature is dangerous but I would

1    submit that defendant's views here are just as

2    dangerous and his skills here in making firearms which

3    the Government also seized are also dangerous.  This

4    case involved all kinds of other items 3D printers,

5    tools, and defendant demonstrated his expertise in

6    making those firearms, and Judge, I know I touched

7    upon that but defendant lists on one of those sheets

8    that I provided to the Court that he's the developer

9    of the first working 3D printed 1911 A1 and that's a

10   style of pistol that he has determined -- the

11   defendant has I guess produced in a 3D printed

12   capacity that is kind of an imitation of an actual

13   firearm, the 1911 A1.  And so defendant has developed

14   these schematics.  It's not just that he knows how to

15   build them.  He has a demonstrated expertise in

16   knowing how to do so, and so just compounding that

17   concern, Judge, there's a website called Odysee,

18   O-D-Y-S-E-E, and it's kind of a -- and I just learned

19   about this a few days ago.  It's kind of a fringe

20   alternative video platform, an alternative Youtube, a

21   fringe website where people post all kinds of

22   concerning posts but in the defendant's posts he was

23   advertising what appeared to be his own designed 1911

24   A1.

25           And so this is plainly an individual who is

1    skilled in making firearms and if he's released on

2    conditions, Judge, that skill set doesn't simply

3    disappear and as I mentioned on Friday and I also just

4    reiterated earlier today, defendant makes posts about

5    arming the masses, and all of this information that

6    I've just presented to the Court and I recognize that

7    it's kind of a lot to digest, it becomes

8    ex-potentially more troubling when you consider that

9    there's no way of knowing whether or not law

10   enforcement has seized every single firearm in this

11   case because as noted -- and I believe I misspoke on

12   Friday when I said this, Judge, but as noted defendant

13   took steps to hide firearms prior to the execution of

14   law enforcement executing the warrant.

15        I believe on Friday I said he did so after.

16   I believe he took steps to conceal the firearms prior

17   to the execution of the warrant, and so sure.  Law

18   enforcement seized numerous firearms in this case,

19   numerous machine guns and all sorts of other parts,

20   but there's no way of knowing that defendant wasn't

21   successful in secreting away additional firearms.  We

22   already know that he has utilized at least three

23   locations where he hid firearms and there's no way of

24   knowing that this individual who promotes these fringe

25   anti law enforcement anti Government views also didn't

1    hide firearms in other places.

2             And I know on Friday, Judge, that

3    defendant -- defense counsel kind of addressed the

4    weight of the evidence so I'd just like to kind of

5    walk through some of that as well for the Court's

6    benefit.  It is significant in this case.  The weight

7    of the evidence is significant.  Law enforcement found

8    the following in defendant's home.  3D printed pistol

9    frames, firearm parts and accessories, ammunition and

10   reloading equipment, various tools and other equipment

11   for making his firearms at home and two machine gun

12   conversion devices, and as for the additional firearms

13   that I referenced that he had secreted away in other

14   places, I believe defense counsel attempted to

15   challenge whether or not those were actually

16   defendants, but I would note that his possession of

17   them is corroborated in a few ways.

18            First, defendant's social media accounts

19   also posted additional firearms and firearm

20   manufacturing equipment which is what peaked the

21   Government's interest in the first place because they

22   said these aren't all the firearms that he was showing

23   on social media so where are those after they executed

24   the state search warrant.  That's what led them to

25   review his tracking activity and his geologic

1    activity -- geographic activity, and so that's kind of

2    what clued them in that he may be secreting firearms

3    in other places.

4         Those firearms that he posted on social

5    media matched many of the firearms that law

6    enforcement recovered and equipment that they

7    recovered elsewhere, and I would also note that law

8    enforcement found that first stash location with the

9    RV that's referenced in the complaint that had many of

10   the firearms.  They found that because they had the

11   tracker warrant and so they knew where defendant went.

12   That's how they knew to go to that address, and

13   defendant stayed there I believe it was approximately

14   40 minutes, Judge, and that was unusual to law

15   enforcement.  That's why they went there.

16        And again, at the end of the day, at least

17   three different individuals told law enforcement that

18   the various firearms found were defendants.  I don't

19   believe that's a coincidence, and I just learned today

20   that law enforcement has also obtained cell site

21   information which corroborates at least one of those

22   individuals accounts that they provided to law

23   enforcement.  And finally, in those boxes, Judge, that

24   law enforcement found, and I'm happy to provide photos

25   of those as well, there were things that were tied to

1    defendant.  There were packages with postal marks with

2    his name on them.

3          And so I don't believe this is a

4    coincidence, Judge.  And if I could just conclude, we

5    also have all these individuals who were seeing

6    defendant's social media posts, kind of an audience so

7    to speak, but it's not just that.  I know that we just

8    charged a single count in the complaint, Judge, but

9    there's also evidence partially provided by some of

10   these individuals who tied these firearms to defendant

11   but defendant transferred firearms.  The firearms that

12   were found at the bottom of the Erie Canal, I believe

13   it was MS had stated that defendant had provided those

14   to him.

15         That's an additional crime.  That could be

16   charged later on, and so there are instances where

17   defendant transferred firearms which means if MS was a

18   recipient of firearms why -- why is it not reasonable

19   to believe that there are his additional customers

20   here and an uncharged customer base, and this

21   investigation is still of course in its early stages

22   and there may still be other individuals out there who

23   defendant has provided firearms to.

24         And so for those reasons, Judge, I would

25   submit that there is clear and convincing evidence

1   that the defendant represents a danger to the

2   community, and given the substantial penalties that he

3   will be facing and the weight of the evidence in this

4   case and defendant's clear and disturbing destain for

5   federal law enforcement and federal laws, the

6   Government has also shown by a preponderance of the

7   evidence that defendant represents a flight risk.

8   Thanks, Judge.

9           THE COURT:  Thank you.  Mr. Wolford?

10          MR. WOLFORD:  Yes, Your Honor.  Well, I

11  guess getting to tying my client to the Twitter

12  account, I heard that there was an anonymous call

13  tying him to the Twitter, a photo and the initials MS.

14  I didn't hear that my client's phone or any other type

15  of identifying characteristic ties my client to these

16  posts.

17          The instance of the social media posts, I

18  guess my confusion is we have two individuals just

19  getting to MS and I guess the other individual I'll

20  just initial here BM, is once again -- and it was

21  brought up and I'm going to harp on it is we have two

22  individuals who may be -- and we have information,

23  we're going to try to dig down on it, they may be

24  manufacturing ghost guns on their own and to as I said

25  before point the finger at my client is an easy point.

1    So I once again question the credibility of these two

2    individuals.

3          Now, I'm not condoning any of the posts that

4    are on what the Government has set-up for the court.

5    I'm just identifying that trying to tie that to my

6    client I have yet to hear that.  It's speculation once

7    again.  Initials, profile photo and an anonymous tip.

8    That's all we have.  I'm sure they were busy all

9    weekend trying to dig down and try to verify the

10   connection and that's what we have.  And so in my

11   opinion they have not met the threshold for

12   establishing and at least tying that to my client.

13         Now, as I said, if we need to dig down and

14   we went through all of these posts and I'm not going

15   to say as I said before condone these, but on Friday

16   the Government with reference to the photo where it

17   says your rights are being stripped away by people

18   with names and addresses, on Friday referred to

19   federal agents as for what this post represented.  I

20   don't see how that is going after federal agents, and

21   once again, speculation on the Government's part to

22   try in my opinion to inflame the situation to prevent

23   my client from being released.

24         And the distribution allegation I'm going to

25   get to the next exhibit or the next post here where it

23

1    says I'm here to arm the masses.  Once again, I
2    question the connection between this account and my
3    client, but now we're now hearing that there's proof
4    of distribution because another individual identified
5    in the affidavit when asked what did you do with the
6    gun says oh, I threw them in the canal and it's from
7    my client.
8            Once again convenient, but that's the only
9    allegation or piece of evidence we have of
10   distribution?  With all the forensic auditing and what
11   we can go through.  They took my client's entire
12   computer, all of his computers all of his house.  We
13   don't have a link of this is what we found on my
14   client's computer.  I wouldn't be arguing that point
15   if the Government was proffering that they found this
16   on my client's computer.  They're speculating that
17   this is my client's Twitter account.
18           And once again, speculating when they
19   question someone what did you do with the guns, oh,
20   they're Peter's guns.  Oh, okay.  Once again,
21   convenient.  Speculation.  Going through some of these
22   other posts, the one -- and I guess the post where
23   FWIW, why even comply with New York or California law,
24   interstate commerce clause being what it is, what can
25   those state AG's do to you being in MI if you choose

24

 1    not to comply with their state of laws.  I guess I'm

 2    missing what's wrong with a post like that.  If it's

 3    coming from my client's, I guess it's wrong to even

 4    put those types of things according to the Government

 5    on a Twitter account.

 6            But what I've heard are concerns from the

 7    Government that can be addressed quite frankly in

 8    pre-trial report and recommendation of release.  The

 9    first of which is condition nine about the computer

10    internet monitoring program.  So the fact that the

11    Government's concerned that my client once he's

12    released is going to go onto the internet and start

13    arming the masses and start getting something going is

14    prohibited very clearly and is going to be monitored

15    by the U.S. Probation.

16            One of the concerns I note for the

17    assessment of danger was the pistol permit has

18    firearms.  My understanding is the pistol permit and

19    the pistols were seized by law enforcement.  The

20    firearms, there was eight long guns that were locked

21    up in a safe.  They have since been removed from the

22    house from my client's wife's father who is a retired

23    police officer from Batavia.

24            And I would note that I know we've heard a

25    lot of rhetoric about my client hating law

1    enforcement.  His brother is an FBI agent and is

2    stationed down in the Manhattan bureau.  My client has

3    a relationship with his brother, in fact went to one

4    of his promotional ceremonies.  As I just mentioned,

5    his wife's father is a retired Batavia Police Officer

6    and I believe his uncle is also retired law

7    enforcement officer, and he has relationships with all

8    of those individuals and is -- so I think there's

9    always some -- two sides to every story, and I think

10   that little indication I think goes along way in my

11   opinion.

12          And if the Government is concerned that my

13   client is going to run out of his house if he's

14   released and go and seize some of the firearms that

15   they didn't seize, and I would note that they've

16   seized -- they went to my client's house, they went to

17   two other houses, they went to an RV, they followed my

18   client prior to the execution of the search warrant,

19   they found those firearms they claim my client posted

20   on social media, but they still have a concern, then a

21   home confinement type of a condition would obviously

22   alleviate any of those types of fears and probation

23   would know where my client went 24/7.

24          He works at Amazon.  He's on vacation short

25   term disability leave.  He would be more than happy to

26

1    comply with whatever condition the Court and pre-trial

2    release come up with to monitor him for that condition

3    as well.  So those two conditions in my opinion would

4    alleviate any of the fears and dangers that were

5    raised by the Government which I do not agree with and

6    I dispute vehemently, but even if they were true,

7    there's those two conditions that would find a less

8    restrictive means than detaining my client during the

9    pendency of this case.  Thank you, Your Honor.

10           THE COURT:  Okay.  Thank you.  Mr.

11    Intravatola, back to this Dr. Freeman 1337.  How do

12    you tie that in with the defendant?

13           MR. INTRAVATOLA:  A few different ways,

14    Judge.  First --

15           THE COURT:  And let me preface that by

16    saying what Mr. -- I guess what's most disturbing to

17    me and people are -- in this country they're entitled

18    to their own ideas whether they like the Government or

19    not.  I'm not going to punish them for that, but I am

20    concerned when it -- when it escalates to the

21    statement of hate cops and manufacturing firearms.

22           That gives me concern, but now Mr. Wolford

23    says his brother is an FBI agent and his father-in-law

24    is a retired police officer.  So I guess I'm really

25    wondering how do you tie in this Dr. Freeman to

27

1    defendant or that they're one and the same?

2         MR. INTRAVATOLA:  Sure, Judge.  Well, first

3    I'll start with how we tie the account to defendant,

4    and I would also note that the federal agents are here

5    today so if the Court requires more clarification I'm

6    happy to confer with them, but I'll tell you as best

7    as I understand the investigation.

8         First, that name didn't just pop out of the

9    blue, Judge.  That's what the anonymous tip to law

10   enforcement said.  They said freeman and the following

11   numbers after it were Celentano's Twitter account.  I

12   understand that by itself maybe not a ton of weight

13   but that's where we get started.  Then the profile

14   pictures with that account matched other firearms that

15   law enforcement seized in this case.  I believe -- I'm

16   going to butcher the breed here, Judge, but I think it

17   was a lambda that was stamped on the icon for the

18   social media account and then that was stamped on

19   certain of the privately made firearms.

20        Then defendant's acquaintance who was

21   referenced in the complaint MS also confirmed that

22   Celentano was the user of the Twitter account.  And so

23   that's kind of where the photographs were provided.

24   I'm happy -- there may be additional details that I'm

25   missing.  I'm happy -- if the Court would find that

1    useful, I'm happy to confer with the agents right now,

2    but that's kind of my understanding of how they ended

3    up tying the account to defendant.

4          Next, with respect to Your Honor's question

5    about, you know, defendant's family who works in law

6    enforcement, defendant has said it himself, Judge.  Be

7    a good and kind neighbor.  Don't give reasons for

8    people to suspect you.  I have no doubt that

9    defendant's public life, defendant's family,

10   everything about defendant checks out when he knows

11   people are looking.

12         What is concerning to us is his private

13   persona.  What does he say when he thinks he's

14   anonymous?  What does he think when he thinks he's

15   anonymous?  That's where the clues are, Judge, and

16   what does he say?  Well, on that account you saw fuck

17   cops, AR15s are for killing cops.  That's the type of

18   stuff, and I recognize, sure, having family members

19   that work in law enforcement first of all is not

20   uncommon but it's also not dispositive when it comes

21   to my father is a Batavia Police officer, my brother

22   works down in New York City.  It doesn't mean that an

23   individual can't also have destain for other law

24   enforcement members, and defendant said in his own

25   words, I won't go all the way back to the internet

1    posts but I believe there was a post that said fuck

2    the AFT which meant ATF, and so sure, there could be

3    isolated individuals who defendant does not want to

4    kill, but that doesn't mean that it can't also be true

5    that generally speaking an individual does not like

6    law enforcement and members of law enforcement.

7            THE COURT:  You --

8    (There was a discussion off the record.)

9            THE COURT:  And Judge, that was just a

10   commentary from the agents who conferred with my

11   colleague.  Some of the firearms that were also

12   reflected in the social media posts match the items

13   that were recovered, and additionally, there were

14   certain videos posted on social media.  I have not

15   reviewed those.  This was just provided to me just now

16   by the agents, but the geo located footage and in the

17   footage it's clear that the area in which defendant

18   was located matches -- the area in which defendant was

19   located, Judge, I believe was outside.  Law

20   enforcement was able to match that to the video and to

21   where, you know, defendant's whereabouts.

22            Additionally, I believe at least one video

23   my colleague has just mentioned that it was actually

24   in fact matching the depiction of defendant's bedroom,

25   and so all of those factors, Judge, together would

30

1    seem to strongly indicate that this individual was

2    defendant, and I recognize that, you know, there were

3    certain burdens at this stage of the case.  There's

4    certain burdens later in the case.  I'd be happy to

5    further demonstrate that to the Court if this case

6    were to progress to that level, but I would submit to

7    you, Judge, that that is entirely in satisfaction of

8    the clear and convincing evidence that we need at this

9    point in the case.

10          And Judge, I forgot to mention one other

11    point with respect to comments that defense counsel

12    had about one of posts.  You know, he said none of

13    that necessarily is pointing to ill intent towards

14    federal agents, that there was the photo of the guy

15    pointing the gun, people with names and addresses are

16    taking your freedom away.  Well, Judge, I would just

17    note that I'm sitting here today before you making my

18    best effort to help curtail defendant's freedom.

19    That's what I'm doing here, and that's what that post

20    is about.

21          And so I would just ask for the Court

22    respectfully to consider all of that in making its

23    determination because I'm sure the Court doesn't

24    typically experience these types of in depth detention

25    hearings, and we are fighting this hard, Judge, and

1  it's because I believe there is a real danger here.

2  And it's my duty to go -- to stand here before you and

3  to advocate for detention because of these concerning

4  things that we saw online.

5          THE COURT:  No.  I understand that, and by

6  the same token, defendant's liberty is at stake right

7  now at least at the preliminary stage, and I -- you

8  know, before I can find something by clear and

9  convincing evidence I'll tell you I'm very concerned

10 by the posts for this Dr. Freeman PHD, but I think I

11 need to hear more.  Perhaps you say you have the

12 agents here?

13         MR. INTRAVATOLA:  Sure.

14         THE COURT:  If they can tie it in, I want to

15 hear that, and I'll give Mr. Wolford an opportunity to

16 question them as well.

17         MR. INTRAVATOLA:  If I might just have a

18 moment, Judge, I'll speak with them.

19         THE COURT:  Certainly.

20         MR. INTRAVATOLA:  Thanks.

21 (There was a pause in the proceeding.)

22         MR. INTRAVATOLA:  Apologies, Judge.  It's of

23 course a developing situation so --

24         THE COURT:  No problem.

25         MR. INTRAVATOLA:  -- I'm learning things as

1    well.

2              THE COURT:  No problem.

3              MR. INTRAVATOLA:  There's five main points

4    I'd like to make just when it comes to tying defendant

5    to social media in addition to what I just said.

6              THE COURT:  Yeah, but what I just indicated

7    is that I want to hear from these folks themselves.

8              MR. INTRAVATOLA:  Oh.

9              THE COURT:  You're relating to me what

10   they've told you, but I think in fairness in many

11   detention hearings perhaps in most detention hearings

12   --

13             MR. INTRAVATOLA:  Sure.

14             THE COURT:  -- there is not actual testimony

15   taken but there can be, and I think this is one of the

16   cases in which I would direct that.

17             MR. INTRAVATOLA:  I'm happy to do that right

18   now, Judge, if I could.

19             THE COURT:  Well, let me ask Mr. Wolford.

20   Do you want to proceed on that today?  Or do you -- I

21   can hold this open but I'm --

22             MR. WOLFORD:  I want to proceed obviously if

23   my client's going to be detained pending this.

24             THE COURT:  Okay.  Fine.

25             MR. INTRAVATOLA:  Judge, there's one thing I

1    want to note.  Sorry to interrupt you.  Of course I

2    have discovery obligations in this case.  I'd like to

3    opportunity to comply with my Jenks and other

4    discovery obligations.  Maybe it makes sense for us to

5    adjourn today.  I'm happy to proceed.  However, I

6    really think it would be -- we would be most

7    comfortable from a constitutional perspective if I

8    could comply with my other discovery obligations

9    before we began putting witnesses on the stand.

10              THE COURT:  What do you want to do?

11              MR. WOLFORD:  If my client gets released

12   then -- today then --

13              THE COURT:  I'm not releasing him today.

14              MR. WOLFORD:  -- I'm all in favor of that.

15              THE COURT:  Well, put it this way.  As I sit

16   here right now, I'm not inclined to release him, but

17   as I indicated, a lot of my concern has to do with

18   whether defendant is in fact the same individual as

19   this Dr. Freeman, and that's what I want to focus on

20   in the testimony.  So we can start that today.  If you

21   have Jenks obligations, I guess if Mr. Wolford wants

22   to start today because it wasn't clear to anybody that

23   I would want actual testimony.

24              MR. WOLFORD:  Sure.

25              THE COURT:  But now I'm saying I do.  So you

34

1    can provide that down the road I guess and we'll hold

2    it open.  So.

3         MR. INTRAVATOLA:  Perhaps it makes sense,

4    Judge.  I'm just thinking about the types of

5    disclosures we would need to make.  Perhaps it makes

6    sense to adjourn for a few days and we have the -- one

7    of the agents swear out an affidavit kind of outlining

8    the Court's specific question there because that, you

9    know, ultimately would be a sworn statement by the

10   defendant -- or sorry, by the Government.  I would be

11   able to provide that to defense counsel, and perhaps

12   that would alleviate the Court's concerns specifically

13   with respect to tying defendant to that account.

14        THE COURT:  Are you saying an affidavit

15   without the possibility of cross examination?

16        MR. INTRAVATOLA:  Well, Judge, I guess a

17   better way for me to describe it would be we file this

18   affidavit, we call the agent to the stand, and then

19   defendant would be able to cross examine and also have

20   the benefit of that affidavit if that makes sense for

21   the Court.

22        THE COURT:  Yeah.  Okay.  Well, back to you,

23   Mr. Wolford.  This -- I don't believe this -- no, I'm

24   certain this is not going to be resolved today so I'm

25   going to hold this open, but we can start today and

35

1  continue later this week, whatever day works for

2  everybody.  We can do the affidavit or we can get

3  right into it today.  Your call.

4         MR. WOLFORD:  Let's get into it today.

5         THE COURT:  Pardon?

6         MR. WOLFORD:  Let's get into it today.

7         THE COURT:  All right.

8         MR. INTRAVATOLA:  Your Honor, the Government

9  calls Special Agent John Nowak with ATF.

10         THE COURT:  And again, just so we're

11  clear -- up here, sir.  Jeff, just so we're clear,

12  what I want testimony on is how the Government ties

13  the defendant into this Dr. Freeman 1337 PHD.  Okay.

14         MR. INTRAVATOLA:  Yes, Your Honor, and if I

15  could just make my record, I'm just trying to be

16  exceptionally careful here with our respect to our

17  disclosure obligations.

18         THE COURT:  I understand.

19         MR. INTRAVATOLA:  I would note for the

20  record that we have not yet provided any discovery or

21  Jenks material to defense counsel.  We're happy to do

22  that.  We'll work on doing that immediately after the

23  hearing and over the next day or so.  If I could

24  briefly have one moment to have a candid conversation

25  for purposes of Giglio with the agent.

```
 1                THE COURT:  Sure.

 2                MR. INTRAVATOLA:  To make sure that he --

 3                THE COURT:  Sure.  Go ahead.

 4                MR. INTRAVATOLA:  Sure.

 5     (There was a discussion off the record.)

 6                THE COURT:  Go ahead.  Thanks.

 7                MR. INTRAVATOLA:  And Judge, I just note for

 8     the record I just had a candid conversation with

 9     Special Agent John Nowak.  He has indicated to me that

10     he has had no issues with his credibility or negative

11     disciplinary findings or anything to that effect.

12                THE COURT:  Okay.

13                MR. INTRAVATOLA:  And so with that, we're

14     comfortable to proceed at this preliminary stage.

15                THE COURT:  Okay.  Thank you.

16                MR. INTRAVATOLA:  Good afternoon, sir.

17                THE WITNESS:  Good afternoon.

18                THE COURT:  You have to -- he has to be

19     sworn.

20                THE CLERK:  We have to swear the witness,

21     please.  Could you raise your right hand, please?

22                J O H N   N O W A K, after having been duly

23     called and sworn, testified as follows:

24                THE CLERK:  Thank you.  Can you please state

25     the name for the record.
```

37

```
 1              THE WITNESS:  John Nowak, J-O-H-N N-O-W-A-K.
 2              DIRECT EXAMINATION BY MR. INTRAVATOLA:
 3    Q.   And sir, what do you do for a living?
 4    A.   I'm a special agent for the ATF.
 5    Q.   And how long have you worked that job?
 6    A.   Since January of 2021.
 7    Q.   As part of your role as a special agent with ATF,
 8    do you work certain investigations within your office?
 9    A.   Yes, I do.
10    Q.   I'd like to draw your attention to the
11    investigation of Peter Celentano.  Are you familiar
12    with that investigation?
13    A.   Yes, I am.
14    Q.   Have you taken investigatory steps in that
15    investigation?
16    A.   Yes, I have.
17    Q.   Are you familiar with steps that other law
18    enforcement officers have taken in this investigation?
19    A.   Yes, I have.
20    Q.   Are you comfortable with testifying as to steps
21    that other investigatory -- that other investigators
22    have taken on this investigation?
23    A.   Based on what I'm aware of.
24    Q.   Understood.  And you've been here in court today,
25    Mr. Nowak; correct?
```

1   A.   Yes, I have.

2   Q.   And did you hear that there was a certain proffer

3   made by the Government with respect to defendant Peter

4   Celentano's tie to a social media account?

5   A.   I have, yes.

6   Q.   And was that social media account freeman

7   followed by several numbers?

8   A.   That is correct.

9   Q.   Okay.  And just for the record, that would be

10  freeman 1337?

11  A.   Correct.

12  Q.   Is that correct?  Now, the Court -- did you hear

13  the Court --

14       THE COURT:  Wait a second.  The documents

15  that you proffered also say @freeman13372.

16       THE WITNESS:  That's correct, Judge.

17       MR. INTRAVATOLA:  Apologies, Judge.  I

18  misspoke.  There was an additional --

19  Q.   Was there an additional digit that I had omitted

20  --

21  A.   There was.

22  Q.   -- Agent Nowak?  Okay.  And so is it fair to say

23  that the entire handle for defendant is freeman13372?

24  A.   That is correct.

25  Q.   Now, did you hear the Court earlier inquire about

1    how law enforcement was able to tie this account to

2    the defendant, Peter Celentano?

3    A.    That's correct.

4    Q.    Are you familiar with the steps with how the

5    Government did that and law enforcement did that?

6    A.    Yes, I am.

7    Q.    Could you testify to those here today?

8    A.    Yes, I can.

9    Q.    Can you please walk the Court through those

10   steps?

11   A.    Absolutely.  So initially, this started with a

12   complaint through a 911 caller.  The 911 caller

13   specifically referenced Peter Celentano in relation to

14   freeman13372.  That's how initially we got the lead on

15   it.  Another investigator utilized a undercover

16   Twitter account to preserve different posts from the

17   freeman13372, and further, that's where it started

18   from.

19           The search warrant was made for that

20   account.  It came back with no subscriber information

21   to which furthermore peaked our interest.  We weren't

22   sure who it was, but on that account there were videos

23   of an individual shooting firearms, some that were 3D

24   printed.  They were very colorful, and there were

25   continuous posts about the -- what was earlier stated

1    the 1911 firearm or model.  It was so named on the

2    Twitter account as okay boomer.

3            There was another link that brought you from

4    that -- from that Twitter account to another page to

5    essentially stating that the okay boomer 3D printable

6    firearm that the file was coming soon.  From then on,

7    (inaudible) speaking but we went from we initiated the

8    search warrant at the house.  We identified the room

9    that that social media account had posted multiple

10   photos of a workbench and additional firearms that

11   were on top of this workbench.  That was observed in a

12   room with -- I don't have the photos in front of me so

13   I can't specifically say, but the room that the

14   workbench was in matched the room that we observed

15   when we executed the search warrant.

16           From that search warrant, that's when we

17   recognized that some of the items we were looking for

18   were not in there.  They must be somewhere else

19   because the bench was missing as well as the multi

20   colored firearms that were on top.  That's what led us

21   to the additional location at Lakeshore, and then it

22   led us to we've been referring to as MS referred us to

23   that house as well, that source.

24           That source identified not only that Mr.

25   Celentano was the user of freeman13372, that he also

41

1    went on to explain that he knew he liked to keep the

2    firearms that were on his desk in a some what rainbow

3    pattern because he had multiple colors of these 3D

4    printed firearms.

5    Q.    Agent Nowak, you referenced earlier some videos

6    of an individual shooting; do you recall that?

7    A.    Yes.

8    Q.    Was law enforcement able to determine -- were

9    those videos outside?

10   A.    Yes, they were.

11   Q.    Was law enforcement able to determine where?

12   A.    Yes.  I'm not familiar with the range, but based

13   on other investigators, they -- they were able to

14   recognize the range that was -- these firearms were

15   being tested or shot at that were posted on the social

16   media account and they recognize it to be within the

17   area of Genesee County.

18   Q.    Now, moving --

19   A.    I believe it was called Godfrey's Pond, but I'm

20   not 100% sure.

21   Q.    Agent Nowak, do you recall that I provided the

22   court with various photos earlier?

23   A.    Yes.

24   Q.    Was one of those photos depicting an AR15?  Do

25   you recall that?

42

1    A.    Yes, I do.

2    Q.    And I believe the caption was something to the

3    effect of I can still hunt deer with this.  Something

4    in sum and substance?

5    A.    I believe so.

6              THE COURT:  It would be easier to just show

7    him the photo.  By the way, I'm going to mark your

8    first packet of photos beginning with this photo, your

9    first packet that you stapled, that would be Court

10   Exhibit 1.

11             MR. INTRAVATOLA:  Understood.  Thank you,

12   Judge.

13             THE COURT:  And then the second packet

14   beginning with a post at the top and then Dr. Freeman,

15   it's two pages, that will be Court Exhibit 2.

16             MR. INTRAVATOLA:  Understood.  Thank you,

17   Judge.

18   Q.    Agent Nowak, I have here what is Court Exhibit 1.

19   Your Honor, I'm showing defense counsel the --

20             MR. WOLFORD:  Just what you had earlier?

21             MR. INTRAVATOLA:  Yes.

22             MR. WOLFORD:  Yeah.

23             MR. INTRAVATOLA:  Your Honor, this is

24   page -- this is Page 10, Your Honor, of Court's

25   Exhibit 1.  May I approach the witness?

43

1                THE COURT:  Yes.

2    Q.    Agent Nowak, do you recognize this document?

3    A.    Yes, I do.

4    Q.    Are you familiar with it?

5    A.    Yes, I am.

6    Q.    Is it fair and accurate and consistent with your

7    investigation in this case?

8    A.    Yes, it is.

9    Q.    In fact, did you provide that image to me?

10   A.    That's correct.

11   Q.    And what is it depicting?

12   A.    It is depict -- it's an AR style firearm and it's

13   also a machine gun.

14   Q.    Um --

15   A.    Presumed to be a machine gun.

16   Q.    Agent Nowak, was that firearm recovered in this

17   case?

18   A.    In pieces, it was.  Yes.

19   Q.    In your training and experience, have you

20   reviewed numerous firearms as being an agent with ATF?

21   A.    Yes, I have.

22   Q.    Is that a common firearm to have?

23   A.    It is not.

24   Q.    Why is that?

25   A.    I wouldn't say that it's not common.  I would

44

1    specifically state that the accessories on it make it

2    more unique.

3    Q.   Why is that?

4    A.   By my stating, I see that there's a fore grip on

5    it and there's like two what I refer to as rail scales

6    on the side of the firearm, and we recovered an upper

7    with similar to exact parts as well as -- as well as

8    that lower.  But I mean, I don't know if it

9    specifically used this lower because again it was

10   broken apart.

11   Q.   Understood, but do they resemble the certain

12   items that law enforcement recovered in this case?

13   A.   Yes.

14   Q.   Okay.  I can take that back.  Just a few more

15   questions, Agent Nowak.  You referenced your

16   familiarity with other law enforcement agents

17   investigations on this case; correct?

18   A.   That is correct.

19   Q.   Is another agent on this case -- apologies --

20   another officer on this case Officer Ryan?

21   A.   Yes, Ryan DeLong.  He's an investigator with

22   Genesee County Sheriff.

23   Q.   Are you aware if Mr. Ryan had a discussion with

24   defendant's wife?

25   A.   From my understanding, yes.  There was a -- there

45

1    was an interview with Investigator DeLong as well as

2    John Clark from State Police with the defendant's

3    wife.

4    Q.   And when was that?

5    A.   That was the day of the search warrant.  The

6    search warrant of the residence.

7               MR. INTRAVATOLA:  And Judge, I would just

8    note I imagine for purposes of this hearing hearsay is

9    admissible?

10              THE COURT:  Yes.

11   Q.   Did Officer Ryan learn anything regarding the

12   defendant from defendant's wife?

13   A.   Yeah.  Investigator DeLong, he spoke with the

14   defendant's wife, and I believe some videos were

15   provided to the defendant's wife that confirmed that

16   was of Peter from the social media accounts.

17   Q.   And so just to clarify, investigators asked

18   defendant's wife if an individual depicted on videos

19   from the freeman social media account were defendant

20   and she confirmed that they were?

21   A.    I would believe so -- I believe so, yes.

22   Q.   And just -- just lastly, are you familiar with

23   any lawsuits that defendant has been involved in?

24   A.    Yes, I am.

25   Q.   And did those lawsuits tie the social media

46

1    account to defendant in any way?

2    A.   Yes, it did, and that's actually why we believe

3    the social media account was further deleted.  The

4    social media account freeman1337 was tied to Peter

5    Celentano in a civil suit.  He was served civil papers

6    I want to say the Wednesday or Wednesday prior to --

7    to us executing the search warrant.

8    Q.   And --

9              THE COURT:  The search warrant was executed

10   on September 29; is that right?

11             THE WITNESS:  That's correct.

12             THE COURT:  Yeah.

13   Q.   And do you recall who the plaintiff was in that

14   lawsuit?

15   A.   The plaintiff was Peter Celentano AKA

16   freeman13372.

17   Q.   Counsel, is it fair to say that was the name of

18   the defendant in the lawsuit?

19   A.   Yes.  That's what I meant, sorry.

20   Q.   Who was the plaintiff in the lawsuit, the person

21   suing the defendant?

22   A.   It was free -- free something.

23   Q.   Is it fair to say it was a gun control advocacy

24   group?

25   A.   Yes.

47

1    Q.    Would it refresh you if I told you it was every

2    town for gun safety?

3    A.    Yes, it would.

4    Q.    Something to that effect?

5    A.    Yes.

6    Q.    And so every town for gun safety was the

7    plaintiff in the lawsuit?

8    A.    Yes.

9    Q.    And Peter Celentano was the defendant in that

10   lawsuit?

11   A.    That's correct.

12   Q.    And did I hear you say earlier that that lawsuit

13   also listed the freeman social media handle as --

14   A.    That is correct.  I don't know if he was the

15   defendant.  I believe he may have been -- may have

16   been addressed as a witness in it, but it -- it

17   furthermore identified Peter Celentano as

18   freeman13372.

19   Q.    Did it say something along the lines of Peter

20   Celentano AKA freeman followed by those numbers?

21   A.    That is correct.

22   Q.    Okay.  I've got no more questions for you at this

23   point.  Actually, if you don't mind, just one moment.

24   (There was a pause in the proceeding.)

25   Q.    Just a few more questions, Agent Nowak.  Is it

1  fair to say you didn't anticipate testifying here

2  today?

3  A.   That's correct.

4  Q.   I'm sorry for that.  You are probably regretting

5  that you came to court today.

6         THE COURT:  You can blame me.

7  Q.   Is it fair to say that you didn't review every

8  single one of your notes prior to this testimony?

9  A.   That would be correct.

10  Q.   And is that because in some ways surprised you by

11  putting you on the stand?

12  A.   Correct.

13  Q.   And if you had reviewed your notes and other

14  facets of this investigation, would you have been able

15  to testify further as to the investigatory steps in

16  this action?

17  A.   Yes I would have.

18  Q.   Okay.

19         MR. INTRAVATOLA:  Your Honor, I have no

20  further questions at this point.

21         THE COURT:  Thank you.

22         MR. WOLFORD:  All set?

23         CROSS EXAMINATION BY MR. WOLFORD:

24  Q.   Afternoon, Agent.

25  A.   Good morning -- or afternoon.

1    Q.    This subscriber information you indicated that a

2    search warrant came back with no subscriber

3    information; correct?

4    A.    That's correct.

5    Q.    What's typically on a subscriber information that

6    would come out from a search warrant?

7    A.    It will have like first name last name basis and

8    emails.  That's where we got that proton email from.

9    Q.    Okay.  What else would be on the subscriber

10   information?  You'd have name.  What about phone

11   number?

12   A.    Name and phone number would generally come back

13   as well.

14   Q.    Okay.  Email?

15   A.    Correct.

16   Q.    What else?

17   A.    I'm not sure.

18   Q.    But nothing came back indicating that Peter

19   Celentano was the registered subscriber to that

20   Twitter account from that search warrant; correct?

21   A.    Not directly, no.

22   Q.    I'm sorry?

23   A.    Not directly.  No, sir.

24   Q.    Now, at the house of my client, a number of his

25   computers were taken; correct?

50

1    A.    That's correct, sir.

2    Q.    Have those been reviewed or looked for for this

3    particular Twitter account?

4    A.    I believe Genesee County Sheriff or the New York

5    State Police may be working on that.

6    Q.    But to your knowledge as you sit here today, you

7    haven't heard that they discovered this particular

8    Twitter account on any of the computers that were

9    seized from my client's home?

10   A.    At this time, no.

11   Q.    Now, you would agree with me that Twitter

12   accounts store certain information on an account;

13   correct?

14   A.    I'm not very tech savvy but --

15   Q.    Okay.

16   A.    Yes.

17   Q.    But what about the internet or the internet

18   address connected to the Twitter account?  Wouldn't

19   that be something that would be discoverable?

20   A.    I'm not familiar.

21         MR. INTRAVATOLA:  Your Honor, I'm going to

22   object.  The witness is not an expert with respect to

23   the intricacies of Twitter merely -- not merely.  He's

24   a law enforcement officer who reviews the returns.

25         THE COURT:  This is cross examination.  He

51

1    can say he doesn't know if that's the case.  Go ahead.

2    Q.    Do you remember the question?

3    A.    Something about the internet and the address.

4    Q.    Let me rephrase it.  The search warrant didn't

5    come back showing that there was an internet address

6    connected to my client; correct?

7    A.    I'm not sure.

8    Q.    It didn't have -- as you indicated, there was

9    nothing directly linking my client to talking about

10   the search warrant on Twitter?

11   A.    It was not my search warrant.

12   Q.    Okay.

13   A.    I didn't fully look into every aspect of the

14   search warrant.  This was done by Genesee County

15   Sheriff's investigators.

16   Q.    Right.

17   A.    Yes, sir.

18   Q.    And I'm indicating to you that you came here and

19   testified that from what you heard from this

20   investigation; correct?

21   A.    Right, correct.

22   Q.    And my question to you is that you didn't hear

23   from these investigators that they had an internet

24   address connecting my client to that Twitter account;

25   correct?

52

1   A.   Correct.

2   Q.   Okay.  And you agree with me -- or to your

3   knowledge, do you know that Twitter can track your

4   geolocation of the user?

5   A.   I believe I'm aware of that, yes.

6   Q.   Okay.  And no one has told you in this

7   investigation that they tracked the geolocation of my

8   client to the Twitter account that's at issue here;

9   correct?

10  A.   I believe -- I'm not fully familiar with all the

11  technology aspect of it, but I think that's why we

12  uncovered that there was a VPN used because it was

13  coming back to a different address that was not like

14  relatively within New York State I think.

15  Q.   So --

16  A.   I don't know for sure.

17  Q.   So it was an address that wasn't in New York

18  State?

19  A.   I don't know.

20  Q.   Okay.  But it wasn't at least where you tracked

21  this Twitter account to my client based upon the

22  geolocation of my client relative to the use of that

23  Twitter account?

24  A.   From my knowledge, no.

25  Q.   Okay.  And you are able to -- at least in your

53

1    expertise, do you know if you are able to track an
2    individual, meaning when they're using the Twitter
3    account you can track them and their location?
4    A.    I do not know.
5    Q.    But at least to your knowledge that wasn't done
6    here?
7    A.    Not to my knowledge.
8    Q.    Now, you indicated that there was a 911 call?
9    A.    That's correct.
10   Q.    Now, did anyone to your knowledge talk to that
11   person?
12   A.    Um.
13   Q.    Let me rephrase it.  Did anyone follow up that
14   phone call and go meet with this individual?
15   A.    I don't know if they've ever met with him.  I
16   know law enforcement has been in contact with them
17   through a private investigator that the 911 caller has
18   hired.
19   Q.    But have you met -- have law enforcement
20   identified who this person is?
21   A.    To my knowledge, no.
22   Q.    Do you know if they're related to I believe you
23   said the gun control advocacy group, the plaintiff
24   that was named in this lawsuit against my client?
25   A.    I do not know.

54

1    Q.   You don't know if that anonymous person was part

2    of this gun control advocacy group?

3    A.   I do not know.

4    Q.   And the time of this lawsuit, when was it --

5    A.   I'm not sure.

6    Q.   -- served?

7    A.   I'm not sure on the specific date.

8    Q.   You did testify though that it was served on my

9    client; correct?

10    A.   Yes.

11    Q.   Okay.  Do you know when?

12    A.   I don't know the specific date offhand.

13    Q.   Was it prior to the search warrant?

14    A.   Yes.

15    Q.   Do you know how many days prior to the search

16    warrant?

17    A.   I'm not aware.

18    Q.   Do you know if it was prior to the anonymous tip

19    made to law enforcement?

20    A.   The tip was made prior to the subpoena being --

21    being served -- not the subpoena, the civil papers.

22    Q.   The lawsuit?

23    A.   Yes.

24    Q.   Within days?

25    A.   Sir, I don't know.

55

1    Q.    Well, was it within a month?

2    A.    A month of what, the 911 call?

3    Q.    Yeah, and the service of the civil lawsuit.

4    A.    I don't want to misspeak.  I think a couple of

5    months.

6    Q.    Between the service of the civil lawsuit and the

7    911 call?

8    A.    Yes.

9    Q.    And the 911 call came prior to the service of the

10   civil lawsuit?

11   A.    That's correct.

12   Q.    We don't know who the 911 caller is --

13   A.    That's --

14   Q.    -- as you sit here today?

15   A.    That is correct.

16   Q.    Now, you would agree with me that it's possible

17   for individuals to break into someone's Twitter

18   account; correct?

19   A.    I can't speculate on that, sir.

20   Q.    Would -- to your knowledge, was anyone involved

21   in this investigation investigating whether or not

22   someone broke into this Twitter account and it was a

23   different user than what is suspected?

24   A.    Not to my knowledge.

25   Q.    So there was no forensic review of any of the

1    computers that were recovered from my client?

2    A.    Not to my knowledge.

3    Q.    And you would agree with me that a forensic

4    review of computers hard drive is the best way to

5    determine --

6              MR. INTRAVATOLA:  Your Honor, I'm going to

7    object.

8              THE COURT:  This is cross examination.  I'll

9    allow it.

10             MR. WOLFORD:  Thank you.

11   Q.    -- is the best way to determine whether or not

12   that individual was posting or was using that computer

13   for whatever is being done?

14   A.    I can't speculate on that.  I don't know if

15   that's the best means necessary.

16   Q.    You indicated on the trial -- or the hearing

17   exhibit, I'm sorry, that the gun that was depicted in

18   the photograph was not recovered in that style or

19   manner, that it was recovered in pieces; correct?

20   A.    That's correct.

21   Q.    And how were you able to identify those pieces

22   that were recovered that were part of this photograph?

23   A.    As I stated earlier, the upper still had its

24   attachments on it.  So if you look at the picture,

25   there's a fore grip on it as well as what would appear

57

1    to be like two green pieces on the side of the

2    firearm.  I refer to those as rail scales.  We

3    recovered a upper that matched that exactly.

4    Q.    So it was the upper that was recovered that

5    matched the item depicted in this photograph?

6    A.    Correct, and then the lower part as you can see,

7    there's a third hole right above the selector switch.

8    Q.    Okay.

9    A.    That would indicate that it's capable of

10   producing a fully automatic firearm.

11   Q.    But that wasn't recovered with that grip; was it?

12   A.    It was not, no.

13   Q.    That was in a different area?

14   A.    Correct.

15   Q.    Was it in the house?

16   A.    No.  It -- the lowers were recovered from the

17   lock boxes that were recovered from Lakeshore --

18   Lakeshore and then the two other locations.

19   Q.    And what were the other two locations?

20   A.    Um.

21            MR. INTRAVATOLA:  Your Honor, I'm going to

22   object.  This is again beyond the scope of direct.

23            MR. WOLFORD:  Well, no.  Actually, he

24   testified about these pieces of this firearm --

25            THE COURT:  I will allow it.

58

1          THE WITNESS:  Can you say that again?

2    Q.    Those other two locations that the pieces of the

3    firearm depicted in the hearing exhibit were

4    recovered?

5    A.    I don't have the exact addresses on hand.  One

6    was in Medina.  I can -- it was at the MS location,

7    and then the other one was in -- I'm not sure, but it

8    was at the BM location.

9    Q.    And you indicate that MS was an individual that

10   told law enforcement that my client was using this

11   Twitter handle; correct?

12   A.    That's correct.

13   Q.    And part of this firearm or this machine gun was

14   recovered in his residence or his barn or his

15   property?

16   A.    That's correct.

17   Q.    The video was my client -- the video of people

18   outside -- how many people were in this video?

19   A.    For the -- he was firing one of the -- one of the

20   3D printed 1911 frames, test firing it.

21   Q.    Right.  My question was -- maybe I didn't hear

22   this correctly.  It was people, the video depicted

23   people outside shooting, or was it just one person

24   outside shooting?

25   A.    I may have misspoke.  It was just one person.

59

1   Q.   Okay.  That person -- what part of the body of
2   that person was in the video?
3   A.   It looked like it was a Go Pro attached to the
4   chest.
5   Q.   So --
6   A.   So his hands and his arms.
7   Q.   Just hold on.  I'm sorry.  So a Go Pro, so the
8   camera was on the person who was firing?
9   A.   Correct.
10  Q.   And so the camera was projecting outward?
11  A.   Correct.
12  Q.   So it wasn't identifying face?
13  A.   I did not see his face, no.
14  Q.   Or the body?
15  A.   Correct.
16  Q.   Just the -- what was depicted?  Hands?
17  A.   Hands and arms.
18  Q.   Anything else?
19  A.   On the person or --
20  Q.   On the video.
21  A.   Are you talking about the firearm.
22  Q.   No.
23  A.   The firearm as well was depicted.
24  Q.   Okay, but I'm talking about the person itself,
25  the body.  Was it just the arms?

60

1    A.    Arms and the hands.

2    Q.    And I believe you testified that that was the

3    video that my client's wife said was him?

4    A.    I can't speculate.  I don't know exactly what was

5    said during the interview between Investigator DeLong

6    and the New York State Police investigator.

7              MR. WOLFORD:  I have nothing further, Your

8    Honor.  Thank you.

9              THE COURT:  Thank you.

10              MR. INTRAVATOLA:  Very briefly, Your Honor.

11              THE COURT:  Yup.

12              REDIRECT EXAMINATION BY MR. INTRAVATOLA:

13    Q.    Agent Nowak, I just have a few further questions

14    that are related to what you were just asked on cross

15    exam.  Do you recall testifying about subscriber

16    information?

17    A.    That's correct.

18    Q.    Do you know if someone's real name is required

19    when applying for a Twitter account?

20    A.    As far as I know, you can use a fake name.

21    Q.    Have you reviewed other Twitter accounts as part

22    of your role as a federal law enforcement officer?

23    A.    I have, yes.

24    Q.    Do they always have correct names for subscriber

25    information?

61

1    A.    I can't tell you.

2    Q.    I noticed you paused there.  Were you just trying

3    to remember?

4    A.    Yeah.  I'm trying to think of some other Twitter

5    extractions that I've done.

6    Q.    Have you ever had subscriber information come

7    back as no subscriber?

8    A.    I'm not sure.

9    Q.    That's fine.  It's not a memory test, and of

10   course, we noted earlier that you are simply doing

11   this off the cuff.  Do you recall discussion on cross

12   exam of an anonymous caller?

13   A.    Yes.

14   Q.    Did law enforcement take other steps as part of

15   this investigation which corroborated what the

16   anonymous caller provided to law enforcement?

17   A.    As far as?

18   Q.    Well, do you recall testifying -- we kind of

19   outlined four, maybe five different ways that you tied

20   the freeman account to the defendant.  Do you recall

21   that?

22   A.    Yes.

23   Q.    Did anything about what the anonymous caller said

24   -- which kind of kicked things off.  Did anything that

25   caller said not match the other things that law

62

1    enforcement found regarding defendant's ties to this

2    social media account?

3    A.    No.   The online caller was pretty spot on with

4    what most of the witness said.

5    Q.    And lastly, you just were asked on cross examine

6    about the various addresses in this case.

7    A.    Correct.

8    Q.    Is it fair to say you didn't have the documents

9    in front of you and this isn't a memory test for you?

10   A.    Correct.

11   Q.    Is it fair to say one of those locations was on

12   lakeshore road in Lyndonville, New York?

13   A.    Yes.

14   Q.    Was another a separate Lyndonville location?

15   A.    Yes.

16   Q.    And was another in Medina, New York?

17   A.    Yes.

18   Q.    And if you had reviewed your documents and had

19   the opportunity to do so prior to immediately

20   testifying in this detention hearing, would you have

21   been able to testify further about those locations?

22   A.    Yes, I could.

23            MR. INTRAVATOLA:  Your Honor, I have no

24   further questions.

25            THE COURT:  Okay.  I'll briefly hear from

1    both of you if you wish to anything by way of summary.

2          MR. INTRAVATOLA:  Sure.

3          THE COURT:  Sir, you can step down.

4          MR. INTRAVATOLA:  Your Honor, I think this

5    is possibly the clearest -- and it may not be how we

6    normally do this, but this may be the clearest way to

7    ever get the mind of a law enforcement officer and the

8    steps of a law enforcement officer.  I just had Agent

9    Nowak sit up there.  The Court had asked him to, and

10   he sat up there with no preparation whatsoever, was

11   cross examined with no preparation whatsoever,

12   answered numerous questions with no preparation

13   whatsoever, and he walked you through, Your Honor, the

14   steps that tied this defendant to those social media

15   accounts.  To my ear, I heard about five different

16   ways, maybe six.  There was the anonymous call.  There

17   were videos of an individual that was shooting in

18   Genesee County.

19          THE COURT:  But wait a second.  I just heard

20   testimony about a Go Pro video that was pointed out

21   ward.  Are you talking about something else then?

22          MR. INTRAVATOLA:  No, Your Honor.  I'm

23   talking about that video.  The individual was not

24   depicted in that video.

25          THE COURT:  Right.

1            MR. INTRAVATOLA:  It was from the point of

2    view.  However, what was depicted was a shooting range

3    in Genesee County.

4            THE COURT:  Yeah.

5            MR. INTRAVATOLA:  The witness credibly

6    testified that there was a shooting range depicted in

7    the Go Pro video that was within Genesee County.  That

8    was the only point I'm trying to make there.  I'm not

9    saying defendant's face or anything was in that video.

10            THE COURT:  Right, but that doesn't identify

11    that the defendant was the person shooting at that

12    point.

13            MR. INTRAVATOLA:  No, Your Honor, but what

14    it does identify that I would submit respectfully is

15    the five various pieces of information that in fact

16    form a constellation of facts that tie this to

17    defendant, tie the social media account to defendant.

18            THE COURT:  Okay.

19            MR. INTRAVATOLA:  I would also note the

20    third piece of information that you heard Agent Nowak

21    testify about.  There was an image of a very unique

22    AR15 from that Twitter account that was tied to

23    defendant and parts of those that matched or

24    substantially matched those pieces were found

25    disassembled when law enforcement executed the warrant

 1    and the other -- the other searchs of the other

 2    properties.

 3            You also heard information that Agent Nowak

 4    learned from Officer Ryan who interviewed defendant's

 5    wife further tying him to those videos which were

 6    posted on the social media account ties him to social

 7    media account.  And lastly, you heard some testimony,

 8    and I can appreciate that Agent Nowak is not a lawyer,

 9    he maybe didn't know whether defendant was a plaintiff

10    or a defendant or a witness, but what he did know was

11    that defendant's name showed up in that lawsuit and it

12    wasn't just that.  Defendant was tied to the freeman

13    social media account in that lawsuit, Judge.

14            And so you have this unique firearm.  You

15    have these various different facts, and it's simply

16    too convenient that they all pointed defendant's

17    location in Genesee County or they would point to

18    defendant himself, and so for those reasons, I think

19    the Government has more than met its standard at this

20    preliminary stage, and the fact that Agent Nowak was

21    able to credibly sit up there with no preparation

22    whatsoever and describe that for the Court only

23    further supports what we've done here today, Judge.

24    And so for those reasons I'll submit that detention

25    remains appropriate.

1          THE COURT:  Okay.  Mr. Wolford?

2          MR. WOLFORD:  Yes, Your Honor.  I think I

3    have more questions now about the credibility of the

4    Twitter account than before the testimony.  I think we

5    have all these other ways of determining whether or

6    not that was my client's Twitter account, and we

7    haven't had any proof of that, name, number, internet

8    access.  We have MS who I still am questioning his

9    credibility now has possession of one part of the

10   firearms that we're talking about, and surprise,

11   surprise, MS is saying that that's my client's Twitter

12   account.

13          So my opinion is still that there has not

14   been clear and convincing evidence linking my client

15   to this account, and a civil lawsuit now is being

16   relied upon by the Government because it identifies my

17   client and an AKA of this Twitter account?  That's now

18   saying that's clear and convincing evidence of the

19   link?  I respectfully disagree 100% with that.  And I

20   think we now have a connection with this civil lawsuit

21   and perhaps this anonymous caller.

22          So Your Honor, like I said, I don't believe

23   there's clear and convincing evidence that this

24   Twitter account is linked to my client, and for those

25   reasons, I do believe that he can be released with

1    certain conditions to alleviate any fears of -- that

2    have been mentioned by the Government.  Thank you.

3            THE COURT:  Okay.  Excuse me.  A lot about

4    this case thus far has been unusual, and what I'm

5    going to do right now is issue an interim ruling

6    giving the defendant the opportunity to further

7    explore some of the contentions that have been

8    proffered by the Government, but I -- as I indicated,

9    the allegations of the complaint itself are very

10   troubling, but compounded by this freeman1337 account

11   which if that is the defendant leads me to conclude

12   that there are no conditions or combinations of

13   conditions that would reasonably assure me that if

14   released he would not pose a risk of danger to the

15   community.

16           And I'm not going to go through everything

17   that has been proffered about the -- about the freeman

18   account in Government's Exhibits -- Court Exhibits 1

19   and 2 other than to say that it's clear that whoever

20   this individual is has a deep animus towards law

21   enforcement, and again, as I said earlier, I'm not --

22   it's not up to me to punish anybody for their views

23   about the Government or anything of the sort, but when

24   it's combined with steps which are taken to act on

25   those views, anti Government or anti law enforcement,

1    then that is very troubling.

2            At this point, I do find by clear and

3    convincing evidence that the defendant has been tied

4    to the freeman1337 account, and therefore, I find that

5    there is no condition or combination of conditions

6    that would reasonably assure that if released he would

7    not pose a risk of danger to the community.  However,

8    as I said, this is an interim ruling.  I'm going to be

9    particularly interested in finding out whether the

10   forensic examination of everything that was taken from

11   his home turns up any reference to this account, and

12   if that examination isn't concluded relatively

13   quickly, I may reconsider, and obviously, the results

14   of that have to be turned over to Mr. Wolford.

15           Mr. Wolford, I'm going to also give you the

16   opportunity if you wish to reopen the hearing to take

17   testimony of others.  Just so you know, I don't put

18   much weight at all on the reference to a civil lawsuit

19   tying Mr. Celentano to this account because I don't

20   know whether that was naming him as a plaintiff, I

21   presume not, or naming him as a defendant or whether

22   that's merely an allegation or whether there's been

23   any proof of that.  I don't even know what the case

24   is.  So certainly, you are entitled to explore that

25   Mr. Wolford and apply to reopen the hearing on any of

1    those bases.  But that's -- unless and until I order

2    to the contrary, that will be my ruling.

3              MR. INTRAVATOLA:  Your Honor, just as a

4    piece of housekeeping.  I noted that the Court said

5    once there's a forensic examination that it seemed

6    that the Court may be interested in hearing about

7    that.  Was the Court more so referring to just kind of

8    the discovery process?

9              THE COURT:  I'm particularly interested in

10   hearing whether any of this forensic examination

11   turned up any reference to this freeman account.

12             MR. INTRAVATOLA:  Understood, Judge.  I

13   guess I'm more so asking what would the mechanism be

14   for informing the Court of that?

15             THE COURT:  You tell me yes, it did or no,

16   it didn't.

17             MR. INTRAVATOLA:  Would there be --

18             THE COURT:  I'm presuming that -- and

19   granted, we are at a complaint stage here.

20             MR. INTRAVATOLA:  Sure.

21             THE COURT:  And normally, you know, we don't

22   get into the extensive discovery that there would be

23   if there is an indictment.  However, for purposes of

24   pre-trial detention or release, I think defendant is

25   entitled to that information.  So --

70

1          MR. INTRAVATOLA:  Sure.

2          THE COURT:  -- if you say something was

3    turned up, I think it should be provided to the

4    defendant, and if you say nothing was turned up,

5    that -- that speaks volumes as well.

6          MR. INTRAVATOLA:  Understood, Judge, and the

7    Government is familiar with its discovery obligations

8    and will of course comply with them.  Just for clarity

9    sake, what -- at what point -- is there a timetable

10   that the Court would require or should we just provide

11   that information on a rolling basis as we receive it?

12   Because of course it's still a developing

13   investigation.

14         THE COURT:  Right, but I think you should

15   provide it on a rolling basis as you receive it.  And

16   also the -- there was testimony -- and granted, you

17   can rely on hearsay evidence in a detention hearing,

18   but there was testimony about what the defendant's

19   wife may have said to another law enforcement officer.

20   Mr. Wolford, you're certainly entitled to explore that

21   as well and call another witness if you want.  But for

22   now that's my ruling.  Okay?

23         MR. INTRAVATOLA:  Understood, Judge.

24         MR. WOLFORD:  Note our exception, Your

25   Honor.

71

```
 1              THE COURT:  Pardon?
 2              MR. WOLFORD:  Note our exception to the
 3    ruling.
 4              THE COURT:  It's noted, and you certainly
 5    can seek review by a District Judge if you wish.
 6              MR. WOLFORD:  Thank you, Your Honor.
 7              THE COURT:  All right.  So I already last
 8    week gave the Government its admonishment about its
 9    Brady obligations and those may come to play here as
10    well depending on what you find.  So then we need
11    to -- oh.  Mr. Wolford, you had reserved on a
12    preliminary hearing.
13              MR. WOLFORD:  Correct, Your Honor.  I'm
14    going to respectfully keep that reservation at this
15    time.
16              THE COURT:  Okay.  Then we need to -- I
17    guess the remaining issue is to decide on the --
18    excuse me -- a dismissal date without prejudice.
19              MR. INTRAVATOLA:  Yes, Judge.
20              THE COURT:  Because you know, counsel, I
21    normally select a date 90 days out.  Does that work
22    for everybody?
23              MR. INTRAVATOLA:  That works for the
24    Government, Judge.
25              THE COURT:  Mr. Wolford?
```

72

1                MR. WOLFORD:  That's fine, Your Honor.

2                THE COURT:  Okay.  So today is October 21,

3      and pursuant to Rule 48B of the Federal Rules of

4      Criminal Procedure, the complaint will automatically

5      be dismissed without prejudice at noon on Tuesday,

6      January 21, 2025.  Do you wish to be heard as to the

7      speedy trial act between now and that date?

8                MR. INTRAVATOLA:  Yes, Your Honor.  The

9      Government would move to exclude the time between

10     today up to and including January 21 of 2025 pursuant

11     to 18 United States Code Section 3161(h)(7)(a) and

12     (h)(7)(b)(4), in that it's the Government's position

13     that the ends of justice served by taking such action

14     outweigh the best interest of the public and the

15     defendant in a speedy trial because with this time the

16     Government will provide discovery and continue to

17     collect it as the investigation unfolds.  Defendant

18     can review this discovery with defense counsel.

19     Defendant can receive effective assistance of counsel

20     and pre-trial negotiations can take place.

21                THE COURT:  Any objection?

22                MR. WOLFORD:  No.  I would join in that

23     request Your Honor.

24                THE COURT:  All right.  I'll adopt counsel's

25     representations as my findings concerning the

73

1    exclusion of time between today and January 21, 2025
2    from the speedy trial act calendar.  For the reasons
3    stated by counsel, I find that the ends of justice
4    served by granting of the continuance outweigh the
5    best interest of the public and the defendant in a
6    speedy trial.  Thank you.
7            MR. INTRAVATOLA:  Thanks, Your Honor.
8            THE COURT:  Have a good evening.
9            MR. WOLFORD:  Thank you, Your Honor.
10   (Proceeding concluded at 3:31 p.m.)
11
12            **CERTIFICATE OF COURT REPORTER**
13
14            I certify that this is a true and accurate
15   record of proceedings in the United States District
16   Court for the Western District of New York before the
17   Honorable Jeremiah J. McCarthy on October 21, 2024.
18
19   S/ Brandi A. Wilkins
20   Brandi A. Wilkins
21   Official Court Reporter
22
23
24
25